IN THE SUPREME COURT OF THE STATE OF DELAWARE

CHAVEZ WATERS, §
§
§ No. 348, 2023
§
Defendant Below, §
Appellant, § Court Below—Superior Court
§ of the State of Delaware
v. §
§ Cr. Id. Nos: 2108006430 A/B (N)
STATE OF DELAWARE, § 2108006834 A/B (N)
§
Appellee. §
§

Submitted: June 26, 2024
Decided: July 15, 2024

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

## **ORDER**

This 15th day of July, 2024, after consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1)     Chavez Waters seeks review of his convictions on charges of robbery in the first degree, possession of a firearm during the commission of a felony ("PFDCF"), and possession of a firearm by a person prohibited ("PFBPP"). Waters' sole claim is that the Superior Court's two-sentence supplemental instruction in response to a jury question was reversible error because it suggested that his confession during interrogation by the police was valid. Waters argues that, given the weight that the jury may have placed on the confession as compared to the "lack

of any physical evidence" connecting him to the robberies, the court's instruction was an impermissible comment on the evidence, potentially confused the jury, and created a high likelihood of prejudice.[1] We conclude that this argument is without merit and affirm.

(2) Around 7:00 p.m. on August 8, 2021, a masked individual approached a store clerk at Creekside Spirits in Newark, Delaware and said, "'Don't be a hero.'"[2] The clerk testified that, after hearing the sound of the masked man's gun, he struggled to open the cash register. The clerk also recalled that the suspect was "counting down like 10, 9, 8" to speed him up.[3] Moments later, the store owner's uncle entered the store, and the suspect pointed the gun at him too, goading him to open the register. Once the clerk finally opened it, the masked gunman put money in a bag and told the clerk and the uncle to move to the back of the store. The initial responding police officer that evening testified that neither the clerk nor the uncle was able to positively identify the suspect but both described him as a black male, more than six feet tall, weighing about 270 to 300 pounds.

(3) Around midnight four days later, a masked person approached the front clerk at Baymont Inn in Newark, Delaware. The clerk described the suspect as a

---

[1] Opening Br. at 5–8.
[2] App. to Opening Br. at A124, A128–31.
[3] *Id.* at A132.

2

"black male, tall, 6' 3" who weighed "about 250 pounds."[4]  The clerk did not recall the suspect's name but recognized him as a "regular,"[5] estimating to the police that night that the suspect had stayed at the inn over 20 times and expressing "80 percent" certainty on the identification.[6]  The clerk testified that the suspect "threw a bag on the desk, and said put the money in the bag and pulled out a gun."[7]  The suspect then counted down from ten.  The clerk put money in the bag, including an envelope labeled "snacks" with cash inside, and gave it to the suspect.[8]  After calling the police, the clerk called his general manager, who reviewed the surveillance footage from her cellphone at home.  She recognized the suspect as someone with whom she had interacted multiple times.  The manager provided a name to the police—Chavez Waters or Walters—expressing about 95 percent certainty that he was the suspect.

(4)     With this lead, the police used a database to find a matching description of Waters.  The police then arrested Waters at his apartment.

(5)     Surveillance footage led the police to search the area surrounding the Baymont Inn.  A set of items—a jacket and pants, a baseball hat, and a pair of sneakers—were located near each other, and these items matched items worn by the suspect during the Baymont Inn robbery.  Close by were a plastic bag and an

---

[4] *Id.* at A197.
[5] *Id.* at A177.
[6] *Id.* at A185.
[7] *Id.* at A177.
[8] *Id.* at A178.

envelope with "Snacks $20" written on it.[9] A detective recognized the logo on the baseball hat from a police-produced flyer describing clothing worn by the suspect in the Creekside Spirits robbery.[10]

(6) The police executed a search warrant at Waters' apartment, finding pants with a logo similar to the one on the jacket found near the Baymont Inn.[11] The police also located a pair of red shorts matching shorts worn by a person caught on surveillance video running near the Baymont Inn about ten minutes after the robbery. The police came to believe that the suspect who robbed the Baymont Inn had discarded the jacket, pants, and shoes in flight, changing into other clothes, including red shorts.

(7) Detective Taras Gerasimov and Officer Paige Klein interrogated Waters, but at one point Officer Klein exited. The recorded interview lasted about an hour and a half. Faced with still shots of a person in red shorts running nearby the Baymont Inn after the robbery and the flyer that contained still photos of the

---

[9] *Id.* at A225–26.

[10] Specifically, the baseball hat found near the Baymont Inn, which was red and white, had a logo that read, "'Talk is Cheap.'" *Id.* at A223. Trial testimony established that the Creekside Spirits robbery suspect wore a "white and blue baseball style hat" that had "the same type" of logo as the one on the red and white baseball hat. *See id.* at A124, A223, A231.

[11] The logo on pants consisted of two concentric circles (the outer one white and the inner black), black letters appearing to spell GBGC in the inner circle, and a check mark inside the C. State's Trial Ex. 15–17; App. to Opening Br. at A205–06. A witness testified that "the logo on the jacket was the same type that we had recovered that was on the pants that we found in Mr. Chavez's apartment." App. to Opening Br. at A205–06. The witness believed that, because both articles of clothing appeared to be made of the same material, they were "one piece." *See id.* at A205–06, A231.

4

Creekside Spirits suspect, Waters confessed to both robberies, saying he wielded a BB gun. He also admitted that he had discarded the clothing captured on video during the Baymont Inn robbery.

(8) Later that evening, Waters sought out Detective Gerasimov and told him that he had used a real gun, which could be found in a vacant apartment adjacent to his. Following Waters' lead, the police located the gun in a utility closet, the gun wrapped in a T-shirt "between the ceiling and the duct."[12] The gun had an extended magazine. Surveillance footage from both robberies appeared to show that the suspect used a gun with an extended magazine. The T-shirt had a logo that matched the logo on other clothing that had been found in Waters' apartment.[13]

(9) The police also conducted a forensic examination of Waters' phone. On the morning of August 8, the phone had been used to search for "'a liquor store near me[]'" on the same street where Creekside Spirits was located.[14] A few hours before the robbery occurred, the phone was used to search "'what time does it get dark in Delaware.'"[15] Four days later and a few hours before the second robbery,

---

[12] *Id.* at 242–43.

[13] In making this connection, Detective Gerasimov did not specify which clothing he was referring to. But a photograph shows a logo on a black article of clothing in Waters' apartment that has irregular shapes with six points and lettering, only one word of which—weight—is legible. State's Trial Ex. 19; App. to Opening Br. at A206–07. The T-shirt found in the adjacent apartment displayed the same logo. State Trial's Ex. 40–42; App. to Opening Br. at A242–43.

[14] *Id.* at A281–82.

[15] *Id.* at A283.

the phone was used to search "'Baymont hotel.'"[16] Searches run about an hour later queried "'what is Baymont shift hours[]'" and "'what is first shift[]'" and "'what is second shift.'"[17]

(10) A three-day trial was held on the robbery and PFDCF charges separately from the PFBPP charges. During closing arguments, the defense asked, after revisiting Waters' interrogation, "[w]as this really a confession or was this a coerced statement?"[18] The jury deliberated for about five hours; about two hours in, the jury posed a question to the trial judge. The jury's note read: "'During the interrogation they read *Miranda* rights and the female asks him are you willing to talk to me. When she is asked to leave, does the *Miranda* right still apply to the male detective?'"[19]

(11) The Superior Court advised counsel that, "because this is a legal question, I'm going to answer the question, let them know that the *Miranda* reading and the acknowledgement does apply to both officers[.]"[20] The court continued, "I am going to remind them that they should not be concerned with any of the wisdom of any legal rule that I give them because I don't want to—they need to focus on the

---

[16] *Id.* The witness says August 11 here, the day before the robbery, but elsewhere the witness correctly identifies the date as August 12. *Id.* at A196.

[17] *Id.* at A283–84.

[18] *Id.* at A324.

[19] *Id.* at A364 (italics added).

[20] *Id.* at A356–57 (italics added).

evidence. This is a legal ruling. It is not evidentiary."[21] The court then heard argument from counsel. The defense did not dispute that there were no *Miranda*[22] issues for the jury to consider. The defense maintained, however, that the court should not answer the question at all. The defense contended that any instruction would amount to a comment on the evidence because it could lead the jury to "think that the interrogation is completely valid[.]"[23] After a ten-minute recess, the court read the following instruction to the jury: "Any issue of *Miranda* rights and defendant's constitutional rights [has] already been resolved. It is within the jury's province to determine the credibility of all statements."[24]

(12) The jury asked two more questions arguably related to the first[25] and ultimately found Waters guilty of all robbery and PFDCF charges. That same afternoon, the jury also found Waters guilty of the PFBPP charges. Later, the court sentenced Waters to thirty-nine years at Level V incarceration, followed by probation. [26]

---

[21] *Id.*

[22] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[23] *Id.* at A357–58.

[24] *Id.* at A363–64 (italics added).

[25] First, "'[i]n the case of a split decision on one of the counts, what are the ramifications?'" *Id.* at A365–66. Without objection, the court answered, "you must not be concerned with the ramifications of your verdict or allow it to influence you in any way in arriving at the verdict. Your verdict must be based solely and exclusively on the evidence presented at trial." *Id.* at A366. Second, the court answered—also without objection—that a transcript of Detective Gerasimov's testimony was not available and that the jury was to rely on its recollection of all testimony.

[26] Opening Br. Ex. B. at 1–3.

(13) On appeal, Waters does not contend that the court's instruction to the jury's first question was an inaccurate statement of law. Rather, Waters claims that, "[i]nstructing the jury on the question posed was tantamount to commenting on the evidence, i.e., that the interrogation as a whole [was] valid because Miranda applied."[27] And he contends that, because the jury's questions reveal that the jury "was focused on the circumstances surrounding the confession" and because the "weight and validity" of the confession was "central to the jury's determination[,]" the court's instruction was reversible error.[28] Waters supports this claim by insisting that the "record is completely devoid of any physical evidence"—that is, no fingerprints or DNA evidence tied Waters to Creekside Spirits, Baymont Inn, or the gun, and the police never submitted any clothing for DNA analysis.[29]

(14) "After the submission of the case to the jury, the court in its discretion may provide supplemental instructions based on a question submitted to the court by the jury during deliberations."[30] Hence, such instructions are reviewed for an abuse of discretion.[31]

(15) To begin with, we reject Waters' claim that the lack of "physical evidence" means that the confession was so "central to the jury's determination"

---

[27] Opening Br. at 7.
[28] *Id.* at 6–7, 9.
[29] *Id.* at 3–4, 7.
[30] *Gonzalez v. State*, 159 A.3d 712, 2017 WL 1214428, at *3 (Del. Mar. 31, 2017) (TABLE).
[31] *Id.*

8

that, without it, the jury would have returned a not-guilty verdict. Abundant other evidence corroborated Waters' guilt. The robberies were committed only days apart, and both the modus operandi of the suspect—who, masked and armed, demanded that money be put in a bag and counted down from ten—and physical descriptions of the suspect—who was a black male, over six feet tall, weighing between 250 to 300 pounds—were alike. Testimony from two members of Baymont Inn's staff identified Waters with 95 percent and 80 percent certainty, respectively. Thanks to Waters' lead, the gun that was found contained an extended magazine that appeared to match the gun and magazine captured in surveillance video from both robberies. The gun was wrapped in a T-shirt, which bore a logo resembling a logo found on clothing in Waters' apartment. During the Baymont Inn robbery, surveillance footage showed that the suspect's jacket also bore a logo similar to a logo found on pants in Waters' apartment. About ten minutes after that robbery, separate surveillance footage captured a person running with red shorts, and red shorts were found in Waters' apartment. Lastly, online searches on Waters' phone were related to Creekside Spirits and Baymont Inn, including by the date and time leading up to the crimes.

(16) We also conclude that the Superior Court did not abuse its discretion in answering the jury's first question. The court conferred with counsel before taking a recess to formulate a permitted response. The jury's question did not refer to the

9

weight or validity of Waters' confession; instead, the question focused on the *Miranda* rule, a legal question.[32] The court's instruction thus isolated the legal question—"[a]ny issue of *Miranda* rights and defendant's constitutional rights [has] already been resolved"—and underscored the jury's role—"[i]t is within the jury's province to determine the credibility of all statements."[33] Put simply, the trial court "properly combine[d] a statement regarding a fact in issue with a declaration of law" without commenting on the evidence.[34] To us, the court's instruction was "'reasonably informative'" and did not "'undermine . . . the 'jury's ability to intelligently perform its duty.'"[35]

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

---

[32] *United States v. Sanders*, 472 Fed. Appx. 376, 380 (6th Cir. 2012) (explaining that the "existence of a *Miranda* violation is a legal question and [is] in the sole purview of the judge. The vehicle for a *Miranda* challenge is the motion to suppress, which a defendant must make before trial."). *See also Harris v. State*, 622 A.2d 1095, 1993 WL 61667, at *2 (Del. Feb. 3, 1993) (TABLE) (citations omitted) ("In Delaware, only the trial judge determines the admissibility of the defendant's statement. The jury's duty is to judge the reliability or weight that will be given to the statement. In that regard, the jury may consider any claim of involuntariness as affecting the weight of the evidence.").

[33] App. to Opening Br. at A363–64 (italics added).

[34] *Herring v. State*, 805 A.2d 872, 876 (Del. 2002); *see also Barksdale v. State*, 832 A.3d 1250, 2003 WL 22227552, at *1 (Del. Sept. 24, 2003) (TABLE) ("Article IV, Section 19 prohibits a trial judge from 'commenting on the weight of evidence or the credibility of the witnesses' but permits a trial judge to 'instruct the jury on the law.'").

[35] *Brokenbrough v. State*, 897 A.2d 767, 2006 WL 954235, at *2 (Del. Apr. 11, 2006) (TABLE) (quoting *Green v. St. Francis Hosp., Inc.*, 791 A.2d 731, 741 (Del. 2002)).